UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RORY L. PURTELL (Deceased),

                      Plaintiff,

    -against-                                    1:11-CV-0390 (LEK)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                      Defendant.

**MEMORANDUM-DECISION and ORDER**

**I.    BACKGROUND**

    **A. Procedural History**

On May 21, 2001, Plaintiff Rory L. Purtell ("Plaintiff") filed an application for a period of disability, disability insurance benefits, and supplemental security income under the Social Security Act, alleging that he had been unable to work since December 8, 1995, due to lower back pain, an anxiety disorder, and depression. Administrative Transcript (Dkt. No. 6) ("Tr.") at 90-92. The Commissioner initially denied the applications, and Plaintiff timely requested a rehearing before an Administrative Law Judge ("ALJ"). Id. at 31. Plaintiff, represented by counsel, appeared and testified at a hearing on December 5, 2002, in Albany, New York, before ALJ Carl E. Stephan. Id. at 53-54. On January 22, 2003, ALJ Stephan issued a decision finding that Plaintiff was not entitled to any of his claims. Id. at 54. Following that decision, Plaintiff passed away on January 27, 2003. Id. at 275. Plaintiff's attorney requested a review by the Appeals Council and the case was remanded to ALJ Stephan on December 23, 2003. Id. at 55, 67-71. Plaintiff's widow, Siobhan Bodt-Purtell ("Bodt-Purtell"), became a substitute party to the suit on March 3, 2004. Id. at 76. On

August 18, 2004, ALJ Stephan again issued a decision finding that Plaintiff was not disabled. Id. at 8-20. Due to an omission in the administrative record, the case was remanded once more by the Appeals Council. Id. at 383-84. A third hearing was conducted before ALJ Hazel C. Strauss. Id. at 407-35. On October 20, 2009 ALJ Strauss issued her decision, finding that Plaintiff was not disabled. Id. at 378.

The present action was commenced pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) following the denial of Plaintiff's requested review of ALJ Strauss's October 20, 2009 decision by the Appeals Council on April 25, 2007. Dkt. No. 1 ("Complaint"). Defendant filed an Answer on August 25, 2011. Dkt. No. 5 ("Answer"). Plaintiff filed a supporting Brief on October 11, 2011. Dkt. No. 7 ("Plaintiff's Brief"). Defendant filed a Brief in opposition on December 28, 2011. Dkt. No. 10 ("Defendant's Brief"). On February 15, 2012, the Honorable Gary Sharpe, Chief United States District Judge for the Northern District of New York, issued an Order terminating the referral to the Honorable David E. Peebles, United States Magistrate Judge, and directing the Court to decide this case directly without a report and recommendation. Dkt. No. 11.

**B. Medical Evidence**

*1. Jerome Kreitner*

The Record indicates that Plaintiff first met with Jerome Kreitner ("Kreitner"), a physician's assistant, on December 12, 2000. Id. at 153. During the visit, Plaintiff had complaints of leg pain, heartburn and reflux problems, and shortness of breath. Id. Kreitner diagnosed Plaintiff with bronchitis and prescribed Effexor, Trazodone, Zithromax, and Prilosec. Id. Kreitner noted that Plaintiff's medical issues did not appear to indicate a circulatory problem. Id. On November 8, 2001, Plaintiff had complaints of lower back pain that he attributed to a fall he sustained six years

prior. Id. at 270. Despite having difficulty standing up from a sitting position, Plaintiff's muscle strength, reflexes, and sensation were found to be intact. Id. Following an appointment with Plaintiff, Kreitner determined that Plaintiff should receive a chest X-ray. Id. at 152. Plaintiff was referred to Greene Medical Imaging, P.C., who performed the chest x-ray on April 4, 2001, and found that Plaintiff's heart was "normal in size." Id. at 156.

### 2. Amelita Balagtas

In June 2001, Plaintiff received a consultative examination from Dr. Amelita Balagtas, a state agency medical consultant. Id. at 177-80. Plaintiff had complaints of lower back pain with radiation down his legs, leg cramps, spasms, and occasional pain in his fingers, which made it difficult for him to hold objects with his right hand. Id. at 177. While he walked with a noticeable limp on his right side, Plaintiff was able to walk on his heels and toes. Id. at 178. Further, his cervical spine demonstrated the full range of motion. Id. On examination, Plaintiff was also found to have normal reflexes in the upper and lower extremities, no spasms, no sciatic notch or sacroiliac joint tenderness, minimal disc-space narrowing, and minimal early lipping. Id. Plaintiff also told the examiner that he could perform independent self-care and operate a motor vehicle on a limited basis. Id. at 177. Plaintiff was diagnosed with unspecified lower back pain. Id. at 179. Dr. Balagtas concluded that Plaintiff would have "limitations in activities requiring bending, lifting, prolonged sitting or prolonged standing." Id. She also found that Plaintiff had "mild limitations in the use of the right hand." Id.

### 3. Annette Payne

State agency psychologist Dr. Annette Payne, Ph.D., evaluated Plaintiff on June 28, 2001. Id. at 181. Dr. Payne determined that Plaintiff had been depressed for most of his life, had a

3

dysphoric mood, pyschomotor retardation, feelings of guilt and hopelessness, fatigue, a loss of self-esteem, and cognitive interference. Id. at 181-82. Dr. Payne diagnosed Plaintiff with major depression without psychotic features and concluded that he was capable of following simple directions and performing simple rote tasks under supervision. Id. at 184. Further, Dr. Payne found that Plaintiff could perform simple tasks and learn new tasks, although he would likely have some difficulty concentrating and performing complex tasks. Id. While Dr. Payne found Plaintiff's psychiatric difficulties were moderately to severely limiting, she noted that "[h]e would be capable of his own financial management." Id.

*6. James Falduti*

Plaintiff's therapist, James Falduti ("Falduti") found that Plaintiff was totally disabled and incapable of any work because of his psychological problems. Id. at 257. In early 2002, Falduti noted that Plaintiff had reported a decrease in anxiety. Id. at 221. Falduti's notes from March 27, 2002, indicated that Plaintiff would experience anxiety when going to the supermarket and that his anxiety level was a four out of ten. Id. at 269. At a subsequent appointment on May 10, 2002, Plaintiff reported that his anxiety was a three out of ten. Id. at 267. In June 2002, Falduti indicated that Plaintiff's condition was improving, allowing him to sleep better although he still had the same number of panic attacks. Id. at 266. At one appointment, Plaintiff brought in some of his paintings and discussed meditating with Falduti. Id. at 264. In Falduti's treatment-plan review from August 8, 2002, he indicated that Plaintiff needed continued treatment to "cope with recurring anxiety and to help him build a support network." Id. at 258. On treatment-plan reviews completed on May 28, 2002, and August 28, 2002, Falduti indicated that Plaintiff "[r]eports good health currently." Id. at 258-59. Progress notes from September 26, 2002, state that Plaintiff had made new friends and was

4

"getting out more." Id. at 261. Falduti's progress notes consistently indicate that Plaintiff's mood was stable, his affect was appropriate, and he was not a suicide risk. Id. at 258-67. On November 8, 2002, Falduti was asked by Plaintiff's attorney to give his opinion regarding Plaintiff's medical condition and indicated that Plaintiff was totally disabled. Id. at 257.

### 5. Theodore J. Sabot

Plaintiff's treating physician, psychiatrist Dr. Theodore J. Sabot, found Plaintiff was "totally disabled from any work due to his psychological problems." Id. at 214. Plaintiff saw Dr. Sabot on four occasions. Id. at 215-216, 220-221. Dr. Sabot first saw Plaintiff on June 7, 2001, and his notes indicate that Plaintiff complained of anxiety attacks. Id. at 215. However, Plaintiff was "in good spirits" and "not suicidal." Id. At a December 27, 2001, appointment, Dr. Sabot noted that Plaintiff was still suffering several anxiety attacks a week. Id. at 220. Dr. Sabot's notes from the final appointment indicated that although Plaintiff reported he was still having anxiety attacks, the Effexor prescription had helped. Id. at 221.

### 6. Autopsy Report

Plaintiff passed away on January 27, 2003. Id. at 275. The autopsy report found Plaintiff had "a markedly enlarged heart and severe occlusive coronary atherosclerosis." Id. Also present were an acute myocardial infarct and myocardial scarring of varying age. Id. The autopsy report made no mention of congestive heart failure or cardiac impairment. Id.

### 7. Aaron Satloff

Independent medical expert Dr. Aaron Satloff was contacted by ALJ Stephan to clarify Plaintiff's mental impairments by reviewing the documentary evidence. Id. at 295-301. On March 9, 2004, Dr. Satloff filed a report concluding that Plaintiff was moderately limited in his ability to

carry out detailed instructions, understand and remember detailed instructions, and make judgments on simple work-related matters. Id. at 296. Dr. Satloff also found that Plaintiff was moderately limited in his ability to interact appropriately with the public, supervisors, and co-workers. Id. at 297. Dr. Satloff stated that Plaintff had an anxiety disorder, depressive disorder, and alcohol dependency. Id. at 298. However, he opined that Plaintiff's impairments did not establish any of the listed impairments because they lacked the necessary level of severity. Id.

### 8. Joseph Doyle

Dr. Joseph Doyle, a cardiologist, also reviewed Plaintiff's medical record following his death and offered his opinion as a medical expert. Id. at 302-08. The doctor found that "[d]espite the autopsy evidence of chronic coronary heart disease terminating in sudden death due to an acute myocardial infarction, there was no prior evidence of or symptoms of cardiovascular disease." Id. at 305. He further found this to be "entirely consistent with the natural history of coronary heart disease, which typically progresses silently for many years [and] is first manifested by sudden [and] unexpected death." Id. Dr. Doyle also filled out a medical-source statement concluding that Plaintiff had the functional capability to lift and carry fifty pounds, stand or walk six hours in an eight hour work day, and sit with no limitations. Id. at 306.

### 9. Vocational Expert

Salvatorre Garrazzo ("Garrazzo") testified as a vocational expert by telephone during the final administrative hearing. Id. at 420-34. Garrazzo testified that a person with the same age, education, vocational profile, and exertional and non-exertional limitations as Plaintiff could not perform Plaintiff's past work. Id. at 423-25. When asked by the ALJ what type of work an individual in a similar situation who also had issues with following directions, difficulties

performing complex tasks, moderately to severely limiting psychiatric issues, and regular panic attacks could perform, Garrazzo testified that such a person could be a housekeeper. Id. at 434.

### C. Plaintiff's Testimony

Plaintiff, now deceased, testified at the first ALJ hearing on December 5, 2002. Id. at 320-41. There, he testified that he was last employed as a maintenance mechanic for the "city." Id. at 323. As a maintenance mechanic, Plaintiff repaired broken windows, doors, plumbing, and other fixture in city-owned apartments. Id. In 1995, he was laid off and did not go back to work because of depression. Id. Prior to employment with the city, Plaintiff worked "various construction jobs" mostly involving sheetrocking, woodworking, and framing. Id. at 324. When asked by ALJ Stephan why he was not able to work, Plaintiff stated, "I'm not able to focus on very much for very long, poor concentration, intense anxiety, medical depression." Id.

Plaintiff testified that his depression began when he was a child. Id. at 329. This led to problems in school, as well as general problems with concentrating, communicating, and anxiety. Id. When Plaintiff was approximately 13 years old, he was treated as an inpatient at Rockland State Hospital where he was placed in a locked psychological ward for running away. Id. at 328-29. Plaintiff also testified that he had been treated as both an outpatient and inpatient at Mount Sinai Hospital in 1989. Id. at 328. Over the years, Plaintiff had various physical injuries, oftentimes the result of on the job accidents at his construction jobs. Id. at 329-30. Plaintiff testified that he was "hit a lot in the head" and that he seemed to be injured more frequently than his co-workers. Id. at 330. Plaintiff also testified that in the past he had been hospitalized for psychotic problems, *e.g.*, "hearing voices and being paranoid." Id. at 336. Plaintiff's testimony also revealed that when he was 16 or 17 years old he attempted to commit suicide by slashing his wrists. Id. He also indicated

7

that he had been hospitalized for his depression, including a period of hospitalization in Albany Medical Center's psychiatric ward. Id. at 325. Plaintiff testified he had been seeing Dr. Sabot at Cairo Mental Health, but that the doctor has since resigned. Id. at 324. In addition to seeing Dr. Sabot, Plaintiff also had been seeing a therapist, Falduti, every two weeks for two years. Id.

On a typical day, the now-deceased Plaintiff testified that he would read, go for walks, and "stare at the walls." Id. at 326. Occasionally he would go to the Water Street Center, where he painted. Id. Plaintiff also testified that he was able to prepare his own meals, do his dishes, and clothe himself. Id. at 327. Further, he indicated that he did his own shopping for groceries, performed general cleaning and household chores like laundry, and took care of his lawn. Id.

At the hearing before ALJ Strauss, Bodt-Purtell testified that she married Plaintiff on October 6, 1984. Id. at 413. Bodt-Purtell testified that Plaintiff had been treated for mental-health issues during their marriage and had attempted to commit suicide in January 1986. Id. at 414. He also had received sporadic treatment for depression at Mount Sinai Hospital for approximately ten years prior to relocating to Athens, New York. Id. Bodt-Purtell further testified that Plaintiff was not active in the lives of the couple's children, was "in and out of jobs," and generally lacked any motivation to get things done. Id. at 415-16. In 1997, Plaintiff separated from Bodt-Purtell and moved to Athens, New York, where he lived with his mother. Id. at 416. Bodt-Purtell testified that she would visit Plaintiff on occasion with their two children, but that this stopped after the death of Plaintiff's mother because of the condition in which Plaintiff kept the home. Id. at 417. Although Plaintiff would try to visit his children in New York City, he had problems dealing with crowds of people. Id. at 418. When asked about Plaintiff's social behavior, Bodt-Purtell indicated that he was isolated and withdrawn at social gatherings. Id. at 419. Finally, Bodt-Purtell testified that each time

8

she saw Plaintiff following his move to Athens, "he progressively got worse." Id.

## II. LEGAL STANDARD

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Instead, a reviewing court will reverse the Commissioner's determination only if the correct legal standards were not applied or if the determination was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see also Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The substantial-evidence standard requires evidence amounting to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). If the evidence is deemed susceptible to more than one rational interpretation, then the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The Court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might

justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner uses a five-step process to evaluate whether an individual is disabled under the Social Security Act.[1]  See 20 C.F.R. §§ 416.920, 404.1520.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, and the five-step process remains the proper approach for analyzing whether a claimant is disabled.  482 U.S. 137, 140-42 (1987).  While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See id., at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of the inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience.  20 C.F.R. § 416.920(g)(1).  Second, the

---

[1] This five-step process is detailed as follows:
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g), 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

## III. DISCUSSION

### A. Commissioner's Decision

The ALJ proceeded through the aforementioned five steps by first determining that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. Id. at 365. Second, the ALJ determined that Plaintiff had the following severe impairments: lower back pain, an anxiety disorder, and depression. Id. Third, after reviewing the record, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 ("the Listings"). Id. at 370. Fourth, the ALJ found that Plaintiff did not have the residual functional capacity ("RFC") to perform any past relevant work. Id. at 375. Finally, the ALJ found that Plaintiff had the RFC to perform less than the full range of medium work as defined in 20 C.F.R. §§ 404.1529 and 416.929 and could do certain types of work. Id. at 371. As noted *supra*, the ALJ's decision became the Commissioner's final decision on February 17, 2011, when the Appeals Council denied Plaintiff's request for review. Id. at 350-52.

### B. Plaintiff's Claims

Plaintiff contends that the Commissioner's decision should be reversed. Plaintiff offers three principal arguments in support of his position. First, he asserts that the ALJ erred in determining that "no symptoms of congestive heart failure or cardiac impairment are reported in treatment records." Pl.'s Br. at 1. Second, Plaintiff argues that the ALJ failed to comply with 20

C.F.R. §§ 404.1527 and 416.1527 by failing to accord adequate weight to the opinion of the Plaintiff's treating physician. Id. Finally, Plaintiff contends that the residual functional capacity determination by the ALJ is not supported by substantial evidence in the record. Id. The Court addresses each argument in turn.

### 1. ALJ's Severe Impairment Determination

At step two of the evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic work activities refer to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); Bowen, 482 U.S. at 141. Examples include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); Bowen, 482 U.S. at 141.

The claimant bears the burden of presenting evidence establishing severity. Miller v. Comm'r of Soc. Sec., No. 05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008); see also 20 C.F.R. § 404.1512(a). Although the Second Circuit has held that this step is limited to "screen[ing] out *de minimis* claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) (citing Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). Indeed, a "finding of not severe should

12

be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work." Bowen, 482 U.S. at 154 n.12; Hutchins v. Astrue, No. 08-CV-943, 2010 WL 786291, at *4 (N.D.N.Y. Mar. 3, 2010); Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999).

In making her step two evaluation, the ALJ found that Plaintiff suffered from lower back pain, an anxiety disorder, and depression. Tr. at 365. However, the ALJ determined that Plaintiff lacked symptoms of congestive heart failure or cardiac impairment, noting that "treatment records from other treating medical sources failed to document any complaints of cardiac related illness." Id. at 366. Plaintiff contends that the ALJ erred in reaching this conclusion and asks the Court to reverse or remand the decision, because the record is "replete with the claimant's complaints of cardiac related symptoms." Pl.'s Br. at 5. Plaintiff asserts "a cardiac impairment would support greater limitations then [sic] was determined by the Administrative Law Judge." Id.

The Court finds that the ALJ's severe impairment determination is supported by substantial evidence in the record. The ALJ points out that the record did not indicate any of the following symptoms: "edema, numbness, headache, diplopia, blurred vision, dysarthia, dysphagia, paresthesias, or weakness in the extremities." Tr. at 366. She also acknowledges the January 28, 2003 autopsy report, which indicates that Plaintiff had an enlarged heart and "myocardial scarring of varying ages." Id. at 367. However, the ALJ cites the medical expert opinion of Dr. Doyle. Id. at 367. Dr. Doyle, a cardiologist, stated that, based on the reported medical evidence, Plaintiff had "[n]o cardiorespiratory symptoms." Id. at 302. Dr. Doyle further indicated that "[d]espite the autopsy evidence of chronic coronary heart-disease . . . there was no prior evidence of or symptoms of cardiovascular disease." Id. at 305. Finally, Dr. Doyle wrote

13

that the lack of symptoms found in the record "is entirely consistent with the natural history of coronary heart disease which typically progresses silently over many years [and] is first manifested by sudden [and] unexpected death." Id.

### 2. Treating Physician's Rule

Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Carter, 221 F.3d 126, 134 (2d Cir. 2000). Generally, this deference is owed because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment." 20 C.F.R. § 404.1527(c)(2), see, e.g., Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

In evaluating whether the treating physician's opinion should be given controlling weight, the ALJ must therefore consider various factors including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 404.1527(c)(2); Shaw, 221 F.3d at 14 (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). In addition, the ALJ must set forth the reasons for the weight that she assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); Shaw, 221 F.3d at 134. The treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions of other medical records, but "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician."

14

Burgess, 537 F.3d at 128.

### a. Dr. Sabot

Plaintiff argues that the ALJ failed to accord adequate weight to Plaintiff's treating psychiatrist, Dr. Sabot, who opined that Plaintiff would be precluded from substantial gainful employment. Pl.'s Br. at 6. The Court, however, concludes that the ALJ's decision to afford limited weight to Dr. Sabot's reports is supported by substantial evidence and therefore is not subject to remand.

While the ALJ's decision does not contain a lengthy discussion of Dr. Sabot's medical report, the ALJ specifically states why she is affording the report limited weight. First, the ALJ notes that the record "contains few progress notes regarding the claimant's mood, affect or any other mentally related findings regarding the claimant's impairment." Tr. at 374. She also emphasizes that Dr. Sabot saw Plaintiff on only four occasions. Id. Ultimately, the ALJ states that Dr. Sabot's opinion "is given very little weight." Id.

Even if the Court might have weighed these considerations differently if the matter had been before it originally, the Court does not find the ALJ's decision to be irrational or unsupported by facts on the record. See Rutherford, 685 F.2d at 62. The Court notes that this explanation is sparse, but given the deferential standard of review afforded to ALJ decision-making, the Court concludes that a "reasonable mind might accept [this explanation] as adequate to support a conclusion." Richardson, 402 U.S. at 401. Therefore, the Court does not find that the ALJ's application of the treating source rule with respect to Dr. Sabot provides grounds for remand.

### b. Falduti

Plaintiff also contends that the ALJ afforded insufficient weight to Falduti's opinion. Pl.'s

15

Br. at 6. Unlike Dr. Sabot, Falduti is a therapist whose treatment of Plaintiff focused on his issues with anxiety and depression. Tr. at 367. In her decision, the ALJ credits Falduti's opinion with "some probative value as he was treating claimant for some time." Id. at 374. However, the ALJ discounts Falduti's finding that Plaintiff was disabled due to mental illness. Id.

As in her discussion of Dr. Sabot's opinion, the ALJ states the reason she afforded (part of) Falduti's opinion limited weight. The ALJ notes that Falduti's treatment records indicate Plaintiff's general compliance with the suggested treatment, as well as lessening intensity in his symptoms. Id. These improvements included painting, going out more, and increased socializing. Id.

The ALJ also noted that the opinions of Dr. Sabot and Falduti were contradicted in the record by the report of Dr. Payne, as well as the report by Dr. Satloff. Id. at 375. In conclusion, the ALJ determined that Plaintiff's "treating medical sources are not supported by substantial evidence. Instead, it is contradicted by substantial evidence." Id. Therefore, the Court does not find that the ALJ's application of the treating source rule with respect to Dr. Sabot and Falduti warrants a remand.

### 3. ALJ's Determination of Plaintiff's RFC

At step four of the evaluation process, the ALJ must determine Plaintiff's RFC. 20 C.F.R. §404.1520(a)(4)(iv), (e); 20 C.F.R. §416.920(e). RFC is:

> what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184 (July 2, 1996)). In assessing the RFC of an individual, an ALJ must consider the individual's impairment

"and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the individual] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). Accordingly, an ALJ must assess the RFC based on all relevant medical evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3). The RFC is then used to determine whether an individual can perform past work. 20 C.F.R. § 404.1545(a)(5)(i). If it is concluded that the individual, based on her RFC, cannot perform past work, an ALJ then utilizes the RFC in step five to determine whether the individual can adjust to other work that exists in the national economy. 20 C.F.R. §404.1545(a)(5)(ii).

At step five, the burden of proof shifts to the Commissioner to show that "there is other gainful work in the national economy [which] the claimant could perform." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998). The ALJ's determination at Step Five of the analysis consists of two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g), 404.1520(g).

Here, the ALJ determined that Plaintiff has the RFC to perform "less than the full range of medium work." Tr. at 371. However, due to depression and anxiety, Plaintiff "suffered moderate limitations in daily living, social functioning, and in sustained attention and concentration." Id. In considering Plaintiff's testimony and the evidence on record, the ALJ concluded that although Plaintiff may have had the medical symptoms he complained of, he was capable of following simple instructions, consistently performing simple work-related tasks, and learning new tasks. Id. The

17

ALJ determined that Plaintiff was unable to perform any past relevant work, as his past work exceeds the limitations set forth in his RFC. Id. at 375. However, the ALJ concluded that based on Plaintiff's age, education, work experience, and RFC, there were jobs that existed in the national economy that Plaintiff could have performed. Id. at 376.

Plaintiff raises two primary arguments relating to the RFC determination: (1) Plaintiff's cardiac impairment prevented him from doing "less than medium work" and (2) there is substantial evidence in the record of infirmities that precluded Plaintiff from being able to perform the basic demands of work as defined by SSR 85-15. Pl.'s Br. at 6.

As to Plaintiff's first argument, the Court notes that if the evidence is deemed susceptible to more than one rational interpretation, then the Commissioner's conclusion must be upheld, see Rutherford, 685 F.2d at 62, and that if supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado, 805 F. Supp. at 153. The Court concludes that the ALJ's decision is supported by substantial evidence. The record supports the ALJ's conclusion that despite Plaintiff's impairments, he had the ability to perform less than medium work.

As to Plaintiff's second argument, the Court refers to its discussion of the physician's opinions *supra*. Because the ALJ found substantial evidence that the treating physicians' opinions were outweighed by other substantial evidence, the fact that these opinions may have supported a different result is not sufficient grounds to remand this matter.

IV. **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED;** and it is further

**ORDERED**, that the Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED: March 04, 2013
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge